**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 21-CR-604** |
| | ) | **Judge Paul L. Friedman** |
| **TYLER SLAEKER** | ) | |

<u>**POSITION OF DEFENDANT WITH RESPECT TO SENTENCING FACTORS WITH INCORPORATED SENTENCING MEMORANDUM**</u>

 **COMES NOW** the Defendant, **Tyler Slaeker**, by and through his undersigned counsel, and pursuant to the Order of this Honorable Court, hereby files this Position of Defendant with Respect to Sentencing Factors with Incorporated Sentencing Memorandum. Section I of this filing addresses the PSR's advisory guideline calculation, and Section II addresses the balance of the factors the Court must consider under 18 U.S.C. §3553(a).

**I. ADVISORY FEDERAL SENTENCING GUIDELINES CALCULATIONS.**

 Mr. Slaeker makes no challenge to the advisory guideline calculation contained in the PSR. The PSR suggests that the Total Offense Level is 4 with Criminal History Category I, resulting in a range of 0 to 6 months.

 Through undersigned counsel, Mr. Slaeker suggested minor factual and typographical corrections to the PSR that were timely submitted to USPO Gavito on October 25, 2022. None of those clarifications impact the guideline calculation.

**II. REQUEST FOR A MITIGATED SENTENCE OF PROBATION CONSIDERING THE GUIDELINE RANGE AND OTHER FACTORS UNDER 18 U.S.C. §3553(a).**

 Section 3553(a) of Title 18 provides, in relevant part, that "[t]he court, in determining the particular sentence to be imposed, shall consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed--

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range ...

(5) a pertinent policy statement–

    (A)    issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code . . .; and

    (B)    that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and,

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The sentence imposed shall be "sufficient, but not greater than necessary, to comply with the purposes set forth in subsection (2) of this subsection." *Id.* By statute, there are no limitations on the information the Court may consider at sentencing "concerning the background, character, and conduct of a person convicted of an offense." 18 U.S.C. §3661. As part of its consideration of these factors, it is important to note "that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. §3582(a).

*Overview*

Tyler Slaeker entered the U.S. Capitol Building on January 6, 2021 and remained in the restricted building for a total of twelve (12) minutes.  At no time either before entering the building, while in the building, or after leaving the building, did Mr. Slaeker engage in destructive, threatening, or assaultive behavior.  He engaged in no acts of vandalism.  At 2:51 p.m., Mr. Slaeker entered the U.S. Capitol through a door at the west-side entrance that was being held open by non-violent protestors.  There were no broken windows or doors or other property destruction on the side where Mr. Slaeker entered.  He walked into the Rotunda of the U.S. Capitol, stood among protestors who were peacefully vocalizing their support, and exited the building at 3:01 p.m. through the east Rotunda door.  After exiting, he was encouraged to re-enter the building by a Capitol guard who had been holding open the door.  Mr. Slaeker turned around and re-entered the building through the same door and then exited again at 3:03 p.m.  Mr. Slaeker's video recording of his activities at the U.S. Capitol confirms the above.  Due to the above-described behavior, Tyler Slaeker entered a guilty plea to misdemeanor trespassing.

Mr. Slaeker has no criminal history, has a lifelong history of gainful employment, and has been an exemplary citizen devoted to public service and family for his entire adult life.  He did not participate in acts of vandalism or violence on January 6, 2021.  His only intention was to be a peaceful protestor imploring his representatives to audit of the 2020 election results.  He was acting upon the direction and encouragement of party leaders at the "Stop the Steal" rally.  Mr. Slaeker requests this Honorable Court sentence him to a term of probation.  In justifying the requested sentence, Mr. Slaeker will address the relevant §3553(a) factors.

### A.   History and Characteristics of the Defendant Nature and Circumstances of the Offense:

#### i.   *Personal History:*

Tyler Slaeker is a 40-year-old, married, father of four children (ages 12, 9, 7 and 6).  He was born into a loving, in-tact home in Seattle, Washington.  Tyler's parents were hard-working individuals who provided a healthy childhood environment, including stability, structure, and educational and other opportunities to grow and learn.  He is the second oldest of four siblings. He also has two-half-siblings from his mother's prior marriage.  Tyler remains close to his siblings.

Tyler's father, Daniel Slaeker, worked as a self-employed window installer for much of his work history.  Mid-career, he went back to school to learn technology and engineering skills which resulted in him becoming an instructor to young craftsmen.  Tyler's father was also active in his children's extracurricular activities, including serving as a Scout Master, youth leader, baseball coach, board member of the little league and eventually as the president of little league in their community.

Tyler's mother, Benita Slaeker, was a stay-at-home mom who later became a para-educator (a support educator in the classroom).  Because she loved making a difference and inspiring young lives, she went back to school to become a licensed, certified full-time elementary school teacher. She served as a president of the Parent Teachers Association (PTA) for the local elementary school. Both of Tyler's parents are now retired.  However, his mother continues to tutor children in need on a part-time basis.  Tyler's parents are excellent role models.

In elementary school, Tyler was diagnosed with ADHD.  Not wanting to be labelled, his parents elected not to treat Tyler's condition with medication, but rather to help him recognize behavioral variables and develop coping skills to counterbalance his ADHD.  Throughout

elementary school and junior high, Tyler was an average student.  By high school, his grades were improving, and by the time of graduation in 2000, he was an excellent student.  Tyler enrolled in community college, where he attended classes for several years but did not acquire a degree.

Tyler has been consistently employed throughout his life.  He got his first job at age 16.  From ages 16 to 19, he worked at Round Table Pizza as a server and cook.  From ages 20 to 23, he worked at Galaxy Movie Theater as the manager.  From ages 24-25, he worked as a bellman at the Sheraton Keauhou in Hawaii.  By age 26, Tyler became a licensed private investigator.  He has worked in that capacity for various companies, including Probe Northwest (2008-2016), Digi Stream (2011-2012), Platinum Investigative Resources (2012-2018), and Ethos Investigations (2019-2021).  Currently, Tyler is doing freelance, contract private investigation work on an *ad hoc* basis.  Recently, he also began working at a local clothing store, Binks Outfitters, two days per week.

Tyler is a dedicated husband and family man.  He and his wife, Alanna, met in school but did not begin dating until after they graduated from high school in 2000.  They have been in a relationship for the last 21 years and married for the last 14 years (since 2008).  Tyler and Alanna began a family within two years of their marriage.  They now have four healthy children (ages 12, 9, 7 and 6).  Tyler is the primary caregiver (with the more flexible schedule).  He gets the children to school and is involved in their after-school activities.  They participate in softball, baseball, and swimming.  Tyler coaches multiple baseball and softball teams each season and has supported the swim team as a lane officiant.  Additionally, he has served as a Scout Master, Cub Scout leader, Sunday school teacher, and as a board member of both the little league and the cooperative preschool where his children attended.

His wife, Alanna Slaeker, is a data analyst for Pfizer.  Her job involves monitoring, analyzing, and publishing data relating to clinical trials conducted by the pharmaceutical company. She is the primary financial provider for the family.  Tyler and Alanna enjoy a wonderful relationship and partnership.

Throughout his adult life, Tyler has been involved in charitable work through his church, the boy scouts, the children's schools and the community.  He has participated in building homes and providing support for struggling families.  He built a playground for the children's co-op preschool in Dash Pointe, Washington.  He has given countless hours to the Boy Scouts and to youth teams.  He is widely considered to be a pillar of his community.

In November 2021, the Slaeker family relocated from the Seattle, Washington area to Fairview, Tennessee.  Since that time, Tyler has immersed himself in his new community just as he did in Washington.  He coaches his children's sports teams, is involved in their school activities and has become deeply active in his church.  Mr. Slaeker has no criminal history.  He has led a life as a role model, upstanding citizen, and dedicated family man.

ii.     *Nature and Circumstances of the Offense:*

In November 2020, following the return of presidential election results, Tyler Slaeker began hearing information about corruption among poll workers and began watching poll worker testimony in state legislative hearings.  He became convinced that the voting process had been contaminated and that the election had been stolen.

By mid-December 2020, Mr. Slaeker began hearing about a "Stop the Steal" rally that would be conducted in Washington DC on January 6, 2021.  Specifically, then-President Trump tweeted about the rally and requested support.  Numerous websites and social media forums posted about the rally and requested that Trump supporters attend in-person.

Toward the end of December 2020, Mr. Slaeker purchased a plane ticket and made hotel arrangements to travel to Washington DC on January 4, 2021.  Mr. Slaeker arrived in Washington DC on January 4, 2021, and did typical sightseeing (Lincoln Memorial, Jefferson Memorial, Capitol, and White House) and visited the Ellipse (the planned rally site).  On January 5, 2021, Mr. Slaeker traveled by subway and Uber (Uber bikes and scooters principally) to continue sightseeing.  He attended various gatherings and heard speakers including General Flynn.

On January 6, 2021, Mr. Slaeker arrived at the Ellipse around 11:30am.  By noon, he put on his bike helmet and climbed a tree to get a better view of the speakers.   Mr. Slaeker photographed and videoed much of his experience that day.  He observed the "Stop the Steal" rally from high in a tree at the Ellipse and was moved by hearing President Trump's speech.  **Exhibit A**, Photo taken by Slaeker from high in a tree at the Ellipse during Trump's speech.  He heard President Trump direct his supporters to "walk down Pennsylvania Avenue to the Capitol" and give legislators and Vice President Pence "the courage to do the right thing."  Mr. Slaeker followed that directive.

At approximately 2:15 p.m., Mr. Slaeker arrived outside the U.S. Capitol building.  Mr. Slaeker was on the west side.  Upon seeing protesters injured from cannisters fired by Capitol Police, Mr. Slaeker put his bike helmet on to protect himself against projectiles.  Mr. Slaeker observed a barricade being pulled down by the crowd and saw the flow of the crowd pushing toward the building entrances.  He saw people entering the U.S. Capitol through an opened (unbroken) door on the west side.  **Exhibit B**, Photo taken by Slaeker showing the door he entered. At 2:51 p.m., Mr. Slaeker entered peacefully into the Rotunda where he continued to capture his experience on video.  **Exhibit C**, Photo taken by Slaeker showing his view within the Rotunda. He began to walk toward Statuary Hall but was turned around by an officer, and Mr. Slaeker

respectfully obeyed, returning to the Rotunda.  At approximately 3 p.m., Mr. Slaeker exited the

building at 3:01 p.m.  Upon exiting, an officer who was holding the door open, encouraged exiting

people to re-enter.  **Exhibit D**, Photo taken by Slaeker showing his view as he exited the U.S.

Capitol building.  So, Mr. Slaeker briefly re-entered through the door held by the officer and then

quickly re-exited at 3:03 p.m.

After exiting the building permanently, Mr. Slaeker observed some chaotic activity outside

among protestors. Some protestors were agitated with each other and began arguing and fighting.

Mr. Slaeker was uncomfortable with what he observed.  After hearing that President Trump had

tweeted for people to be peaceful and go home, Mr. Slaeker returned to his hotel where he shared

his photos and videos with his mother and others.  His mother posted his images on Facebook.

Mr. Slaeker's participation was reported to law enforcement by a family member who saw his

mother's Facebook posts.

While on U.S. Capitol property, Mr. Slaeker did not engage in acts of vandalism or

violence.  He was a peaceful (although trespassing) protestor.

### iii.    *Aberration and Character:*

Before January 6, 2021, Tyler Slaeker had never participated in a protest.  His desire was

to have a voice – not to take part in a dangerous or destructive situation.  It was not until after he

was leaving the Capitol that he witnessed a small group of protestors engaged in violent and

destructive acts at the Capitol's lower west terrace tunnel entrance.  Being a rule-breaker is out of

character for Mr. Slaeker.  This circumstance was an aberration in the scope of Mr. Slaeker's

otherwise exemplary life of good citizenship.  He knows it was wrong to trespass on U.S. Capitol

property and takes full responsibility for his actions.  He has no criminal history and is a "true

zero" – meaning he has absolutely no criminal record – a designation being considered by the

Sentencing Commission for favorable guideline consideration. That "true zero" status empirically reflects the aberration this conduct represents.

As set forth above, Tyler Slaeker is a man who is dedicated to his family, friends, church, and community. Attached to this filing are character letters written by a variety of individuals who know him best. *See*, **Exhibit E** (Character Letters). The letters were written by family members, friends, church members, his employer and other people who know his true character. The letters speak for themselves and supplement the suggestions made herein about Tyler Slaeker's "history and characteristics." *See*, **Exhibit E.**

> **B.     Need for Sentence Imposed to Reflect Seriousness, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public and provide treatment:**

A sentence of up to five years of probation is statutorily available, but the guidelines suggest a maximum term of probation of three years. A term of probation of three years would reflect the seriousness of this misdemeanor offense as shown by the specific conduct of Mr. Slaeker, would promote respect for the law, and provide just punishment for the individual actions of Mr. Slaeker. Such a sentence would afford adequate deterrence to criminal conduct and would protect the public from the highly unlikely further crimes of Mr. Slaeker. As the Court is aware, a sentence of probation is a significant punishment for a misdemeanor crime. Probation restricts one's freedom of action and movement and holds one accountable for years to a supervisory authority. It instills a sense of responsibility where it is lacking and provides a structural backdrop for success. Here, imposing a term of years of probation would be a just and appropriate sentence that achieves the balancing of §3553(a)(2) factors.

### C.      The Kinds of Sentences Available and the Sentencing Range:

Mr. Slaeker pled guilty to entering and remaining in a restricted building, a misdemeanor. He is subject to a maximum statutory sentence of one year imprisonment, a maximum term of supervised release of not more than one year, and a $100,000.00 fine. See 18 U.S.C. §3553(a)(3). The Sentencing Guidelines range is between 0 and 6 months. See 18 U.S.C. §3553(a)(4). The Court may either sentence Mr. Slaeker to a sentence of up to one year imprisonment followed by a one-year term of supervised release, or the Court may sentence Mr. Slaeker to a sentence of up to five years of probation, with conditions associated with the probation. If the Court were to sentence Mr. Slaeker to any term of imprisonment, the Court will be limited to only one year of supervised release following the completion of that custodial sentence. Alternatively, if the Court elects not to impose a custodial sentence, Mr. Slaeker can be ordered to serve a period of probation of up to five years. Of course, to the extent the Court deems it appropriate, the Court could impose a term of home detention as a condition of probation.

### D.      Restitution:

Pursuant to his plea agreement, Mr. Slaeker has agreed to pay restitution of $500.00. By agreement, he will not be subject to joint and several liability for the damages done to the U.S. Capitol. Mr. Slaeker reports that he will pay his restitution obligation and special assessment immediately after the judgment is entered.

### E.      Recommended Sentence by US Probation:

USPO Gavito has made certain sentencing recommendations in the Presentence Report. Docket Entry 51. USPO Gavito recommends the Court impose a sentence involving: no term of incarceration, no term of supervised release, three years of probation, no fine, $500 in restitution

and a $25 special assessment.  She further recommends that Mr. Slaeker's supervision and jurisdiction of the case be immediately transferred to the Middle District of Tennessee.

**Conclusion**

Tyler Slaeker respectfully requests that the Court consider the above information and arguments as well as those set forth in his PSR when fashioning the appropriate sentence in this case.  Counsel respectfully suggests that a sentence of three years of probation, no fine, $500 in restitution and a $25 special assessment with case jurisdiction and supervision being transferred to the Middle District of Tennessee is an appropriate sentence for all the reasons set forth herein.

Respectfully submitted,

**HODDE & ASSOCIATES**
40 Music Square East
Nashville, TN  37203
(615) 242-4200

BY:   s/ Kimberly S. Hodde
        KIMBERLY S. HODDE
        Attorney for Defendant Tyler Slaeker

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been sent via the Court's electronic filing system, *or*, if not registered, sent U.S. Mail, postage prepaid, to:

Nadia E. Moore
Assistant United States Attorney (Detailee)
271 Cadman Plaza East
Brooklyn, NY 11201
(718) 254-6362
nadia.moore@usdoj.gov

Benet Kearney
Assistant United States Attorney (Detailee)
1 St. Andrew's Plaza
New York, NY 10007
(212) 637-2260
benet.kearney@usdoj.gov

Aidee V. Gavito
US Probation Officer
(202) 565-1351
Aidee_gavito@dcp.uscourts.gov

this 5th day of December, 2022.

/s/ Kimberly S. Hodde
KIMBERLY S. HODDE