**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-604 (PLF)** |
| **v.** | : | |
| | : | |
| **TYLER SLAEKER,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Tyler Slaeker to a term of incarceration of three months, which is the middle of the guideline range as calculated by the United States Probation Department, followed by one year of supervised release, 60 hours of community service, and $500 in restitution.

I.   **Introduction**

Defendant Tyler Slaeker, a 40-year-old freelance private investigator, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars in losses.[1]

---

[1]   Although the Statement of Offense in this matter, filed on June 10, 2022, (ECF No. 45 at ¶ 6) reflects a sum of more than $1.4 million dollars for repairs, as of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Slaeker pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(1), Entering and Remaining in a Restricted Building or Grounds, a Class A misdemeanor. As explained herein, a jail sentence is appropriate in this case because (1) Slaeker prepared for violence by bringing a helmet to Washington, D.C.; (2) during the significant time that he spent on Capitol Grounds and the approximately 15 minutes that he spent inside the Capitol building, Slaeker extensively recorded acts of violence and property destruction on his cellular telephone, including (a) rioters attempting to enter the East Rotunda doors, the windows of which had already been broken; (b) rioters arming themselves with piping on the Upper West Terrace; (c) rioters overrunning the Lower West Terrace and attempting entry into the Capitol through an archway and tunnel; and (d) lines of officers attempting to disperse the rioters; (3) he climbed the scaffolding that had been erected at the Capitol in preparation for the January 20 inauguration; (4) he entered the Capitol building multiple times and was present in multiple locations of the Capitol; (5) his statements after January 6 reveal a total lack of remorse; and (6) his social media statements reveal he believes a civil war is coming and suggest the possibility of similar future criminal conduct by this defendant.

The Court must also consider that Slaeker's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. *See United States v. Thomas Fee*, 1:21-cr-00131 (JDB), Tr. 04/01/2022 at 17 ("The defendant was an active participant in a mob assault on our core democratic values and our cherished institution. And that assault was intended by many and by the mob at large in general to interfere with an important democratic processes of this country. I cannot ignore that, cannot pull this misdemeanor out of that context.") (statement of Judge Bates). Slaeker's actions and those

2

of his fellow rioters enabled the breach of the Capitol, threatened the lives of the police officers, legislators and their staffs, and disrupted the certification vote for several hours. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, the facts of and circumstances of Slaeker's crime support a sentence of a term of incarceration of three months.

## II. Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 21 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent— contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Slaeker's conduct and behavior on January 6.

### Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds

Assaults against law enforcement on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible.  Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk. The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



*Exhibit 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]"[2]  These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds.  At approximately 12:45 p.m., a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway.  Seeing this, a half dozen USCP officers began to gather behind what is labeled in Government's Exhibit 1 as "1st Police Barricade," circled in red and marked as Area A.  At 12:52

---

[2]     Even prior to arriving at the Capitol on January 6, 2021, Slaeker was aware that the Capitol Grounds had been restricted.  On the evening of January 5, 2021, Slaeker walked past the Capitol building, which he photographed and noted that it was "blocked and closed."

p.m., the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to engage with USCP officers at the first manned barrier.  Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob.  By 12:58, the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's Exhibit 1.  They flooded the area labeled "Lower West Plaza" Area C on Government's Exhibit 1, pushing against the barricade there.



*Exhibit 2: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza.  For the next

hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Exhibit 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left).  In the photo of the nearly completed bicycle rack barrier line as of 1:39 p.m., a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 p.m., the crowd began to grow even more rapidly, supplemented by those who had walked the more than a mile and a half from the Ellipse to the Capitol.  At 2:03 p.m., Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd.  It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately. This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left. On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles. Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves. By 2:28 p.m., with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called. With their defensive lines extinguished, several police officers were surrounded by the crowd. The rioters had seized control of the West Plaza and the inauguration stage. There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 p.m. to build to a torrent.







*Exhibit 4: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and*

*many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

### *Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the doors of the West Front of the U.S. Capitol Building*

The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line. *Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the area known as the Lower West Terrace ("LWT"). The entrance usually consists of a flight of stairs leading to a doorway. On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long. That tunnel led to two sets of metal swinging doors inset with glass. On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building. The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building. This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day. Exhibit 5; "Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.



*Exhibit 5*

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby. Members of the United States Capitol Police ("USCP"), assisted by officers from the District of Columbia Metropolitan Police Department (MPD), were arrayed inside the doorway and guarding the entrance. Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 p.m., the mob broke the windows to the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist. The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement with batons, poles, chemical

spray, bottles and other items.  Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray.

*Defendant Slaeker's Role in the January 6, 2021, Attack on the Capitol*

After attending the "Stop the Steal" rally at the Ellipse, Slaeker traveled 1.7 miles to the U.S. Capitol.  Slaeker had almost two miles to change his mind and decide to turn back. But instead, he chose to press forward.  There, Slaeker would have many additional opportunities to turn back.  Each time, he continued.

While on Capitol Grounds, Slaeker spent time on the West Front of the Capitol, where he not only observed the violence that occurred, but also scaled the scaffolding present so that he could better document the mayhem.[3]   Slaeker saw and recorded how outnumbered the law enforcement officers were.  He also observed the police valiantly attempting to repel the mob of rioters and explained to his mother that he'd seen a police officer who was using a "pepper spray gun." Slaeker believed that officer might have been U.S. Capitol Police Officer Brian Sicknick, who died shortly after spending January 6 defending the Capitol.

Slaeker also sent the following image to his mother, referring to the officer as "the guy with blood on his face."  Slaeker further explained that "[w]hen [he] saw [the officer] minutes after this photo was taken his visor was flipped up, his mask was gone, and he had blood running down his face from a wound on his left eye brow."  Slaeker also explained to his mother that he observed an officer get "sprayed and hit with a fire extinguisher."

---

[3]      On the morning of January 7, 2021, Slaeker sent a number of photographs to an individual with the initials "J.C.", one of which was of scaffolding on the west front of the Capitol.  Slaeker explained that "[t]his is the scaffolding i climbed to take that picture."



*Exhibit 6*

Undeterred by observing the violence of the West Front and the injuries that the police were sustaining as they fought to protect the Capitol Building, Slaeker then traveled to the Lower West Terrace. At approximately 2:41 p.m., Slaeker walked into the tunnel of the Lower West Terrace and documented the confrontation between rioters and police.   As discussed above, within approximately one minute, the mob broke the windows to the first set of doors from the tunnel to the Capitol Building.



*Exhibit 7*

Undeterred by violence and injuries to police officers that Slaeker observed on the West Front and the Lower West Terrace, Slaeker continued on and decided to enter the Capitol Budling. At approximately 2:44 p.m., as Slaeker made his way to the Upper West Terrace Door, where he would enter the Capitol building, he encountered rioters breaking and arming themselves with pieces of scaffolding that was present to build the inauguration stage.  Instead of turning back after seeing this additional chaos, Slaeker opted to photograph it.



*Exhibit 8*

While filming on his cellular telephone, Slaeker entered the building at approximately 2:45 p.m. through the Upper West Terrace Door, which had been opened from the inside by other rioters.



*Exhibit 9*                    *Exhibit 10*

While inside the building, Slaeker was with a mob of rioters that entered the Rotunda of

the U.S. Capitol building.  There, Slaeker took a number of photographs that he sent to his mother,

who then posted them on Facebook.



*Exhibit 11a*



*Exhibit 11b*

The bottom image in Exhibit 12, which was posted on Slaeker's mother's Facebook page, is consistent with a photograph taken from Slaeker's position in the Rotunda in Exhibits 11a and 11b.  First, it depicts the paintings "Surrender of Lord Cornwallis" and "General George Washington Resigning his Commission," which are across the Rotunda from the paintings "Baptism of Pocahontas" and "Embarkation of the Pilgrims."  Furthermore, an individual with a yellow flag is standing in front and to the right of Slaeker in Exhibits 11a and 11b and an individual with a yellow flag is in the lower righthand corner of bottom image in Exhibit 12, which would be in front and to the right of the individual who took that photograph.



*Exhibit 12*

Slaeker then exited the Rotunda, walked about in the entryway and hallway outside of the Rotunda before reentering the Rotunda.



*Exhibit 13*



*Exhibit 14*

Slaeker left the building at approximately 3:01 p.m.   However, just after exiting the building, he turned around and reentered the building through the same door.   Slaeker ultimately left the building through this same door a few minutes later.



*Exhibit 15*

In addition to the violence that Slaeker observed on the west side of the Capitol, he also observed violence on the Capitol's east side.  Between approximately 3:09 p.m., and 3:45 p.m., Slaeker took photographs and videos of the breached East Rotunda Doors.  The photographs show that the doors had already been damaged, and that officers were inside the doors attempting to keep out the hordes of rioters attempting to break into the building.



*Exhibit 16*



*Exhibit 17*

Slaeker sent his mother photographs that he had taken of the breach of the East Rotunda Doors while on Capitol Grounds.  His mother responded that there had been reports "that the crowd 'breached' the entrance and is fighting the police to get to the floor" and "they broke down a door." Slaeker who was present and personally observed the violence, responded "Yes.  That's all definitely true."

After documenting the destruction on the east side of the Capitol, Slaeker circled the building and sought out the one place where rioters were still violently attacking law enforcement – the Lower West Terrace.  Exhibits 18 and 19, taken by Slaeker at 4:32 p.m. and 5:07 p.m., respectively, show that after observing police officers being attacked by mobs of rioters and the

Capitol building being violently damaged for more than two hours, Slaeker chose to stay and document the continued mayhem and vicious attacks.



*Exhibit 18*



*Exhibit 19*

*Slaeker's Lack of Remorse*

Slaeker's actions and words both during and after the Capitol riot were extremely cavalier and show a complete lack of remorse for his actions.  For instance, on the afternoon of January 6, 2021, he texted "J.C." that he was "[i]nside the Capitol building [on a] [s]elf guided tour."  Slaeker made the same flippant joke to an individual whose initials are "S.W.", telling her that he wasn't watching the news because he was "[b]usy" in the "Dc. Capiol building" on a "[s]elf guided tour."  Slaeker further told S.W. that he had tried to "document" the riot the way he documents a case, and that "[i]t was beautiful."  Four days later, on January 10, 2021, S.W. sent Slaeker a picture of a mock-up of a "Capitol Invasion" Lego set.  Slaeker responded "Haha!  I wish that were real."



*Exhibit 20*

While Slaeker recognized the illegality of his actions, he was not remorseful.  After sending J.C. a number of photographs that he had taken of the Capitol riot, Slaeker admonished J.C. "don't go sharing that" because "[t]hey seem intent on prosecuting."   In his text conversation with J.C., Slaeker made it clear that he did not regret his participation in the attack on the Capitol, messaging that "[t]hey threw tea in a harbor for much less of an attack on freedom. I'm supposed to feel

ashamed for marching into the capitol building to say enough?!"  On January 7, 2021, Slaeker also

expressed his belief that things would only get worse, explaining that "It is going to get ugly

because it's not like they listened to the 500k that were there. They quadrupled down, told them

all to shut up, then silence them while calling them evil. No one there is saying to themselves, 'gee

I guess they're right, I am evil and the election was fair. My bad'."

When J.C. told Slaeker that he would "join a forceful revolution" if he believed enough

people would join him, Slaeker did not admonish the potential for treason. Instead, he merely told

J.C. "I wouldn't put that in print very often.  Ha.  Hopefully it won't come to that, but shouldn't

we be fighting to preserve our freedom and our county?  The foundation of our country is being

demolished and no one seems to care. Those that do are demonized and deplatformed. We're way

past chucking tea."

On January 7, 2021, instead of being sorry that he had participated in an assault on the

democratic process, Slaeker was disappointed that he was unable to explore Washington, D.C.,

because of the security measures taken in response to the riot in which he participated, texting J.C.

"the city is locked down.  Sucks that I can't explore."

More recently, Slaeker posting under the username "bananaguard62," has made posts on

the internet forum TheDonald that reveal that he believes a civil war is coming and suggest the

possibility of additional criminal conduct by this defendant.

*Linking Slaeker to the "bananaguard62"*[4]

Based on his posts, it is believed that Slaeker is "bananaguard62."  For instance,

"bananaguard62," like Slaker, previously lived in the Seattle area before moving to Tennessee, has

---

[4]      The posts referenced herein are available on the Internet Archive's "wayback machine."
The Internet Archive functions to preserve certain publicly available internet pages at particular
moments in time, *i.e.*, it takes a snapshot of the appearance of a public-facing webpage.  As a

a kitchen identical to Slaeker's, had a 72-year-old mother in 2021, is a little league parent and was arrested for activity on January 6 and posted a link to Slaeker's arrest and had access to an email that AirBnB sent Slaeker terminating his account.  See PSR page 1; ¶¶ 41, 45, 46, 55–58; see also e.g.   https://web.archive.org/web/20210415231036/https://patriots.win/p/11R4XGp7Lt/no-more-talk-of-secession--as-a-/;

https://web.archive.org/web/20210518181021/https://patriots.win/u/bananaguard62?type=comment&sort=new&page=2;

https://web.archive.org/web/20210415062957/https://patriots.win/p/11Q8glN392/tim-was-pretty-bitchy-last-night/;

https://web.archive.org/web/20210519001455/https://patriots.win/u/bananaguard62?type=comment&sort=new&page=4;

https://web.archive.org/web/20210518210053/https://patriots.win/u/bananaguard62?type=comment&sort=new&page=3.

Bananaguard62 is also, like Slaeker, a private investigator.  As seen in exhibit 21, on December 16, 2020, Slaeker as bananaguard62 posted that he works as a private investigator.

by **bananaguard62**

▲   **bananaguard62** 4 points 153 days ago  +4 / -0
▼   Ha. Truth be told, I actually love my gator. I work as a private investigator so I get to conceal my face and go with a new look everywhere I tail someone. New hat, New gator, I'm a new person.
permalink   context   all comments (68)   save   report   block

*Exhibit 21*

result, one can use the Internet Archive's "wayback machine" to retrieve website information from a particular time if a snapshot was taken of the particular public-facing webpage. The Internet Archive employs a process that produces a historical snapshot that accurately records the content of publicly available web pages on the day that the snapshot was taken.

### **Slaeker's Belief that the 2020 Presidential Election was Stolen**

On January 6, 2021, prior to the events at the Capitol, Slaeker attended the "Stop the Steal" rally against the results of the 2020 Presidential Election. Statement of Offense, (ECF No. 45 at ¶ 8).   On November 13, 2020, Slaeker, as bananaguard62 posted "And it looks like it might be enough to steal a presidency. Odds are still against Trump despite the hammock of evidence."[5]

### **Slaeker's Involvement in January 6, 2021**

On December 24, 2020, Slaeker as bananaguard62 posted the following, which references his intent to travel to Washington, D.C. for January 6.

by **blvckhelicopters**
   **bananaguard62** 3 points 146 days ago  +3 / -0
   Here's one Seattle-ite hoping to head to DC on the 6th! There are a lot of us pedes even in King County. While canvassing before the election people would whisper to me that they are republican and voting for Trump.
   permalink   context   all comments (289)   save   report   block

*Exhibit 22*

On May 8, 2021, Slaeker as bananaguard62 posted "The founders put up with far, far less before saying NO. Those there on the 6th were saying no. I've realized that, especially here in Seattle, the conservatives are cowards. So many tell me they totally agree, but ____, and rules are rules. They give into the fear, give into the rules, and submit in mind and body. It is sad to see."[6]

On May 30, 2022, Slaeker as bananaguard62 posted "I am a Jan6 defendant. I only have access to discovery for only a limited time. What questions need answered? What should I spend

---

[5]     This post is available at
https://web.archive.org/web/20210415001135/https://patriots.win/p/11Q8XUojHt/fraud-alert-dominion-responsible/

[6]     This post is available at
https://web.archive.org/web/20210518181021/https://patriots.win/u/bananaguard62?type=comment&sort=new&page=2

my time investigating? I have access to virtually all Capitol cams as well body cams and cp testimony. Ideas?"[7]

### Slaeker's Posts That Indicate a Lack of Remorse and Reference Civil War

On January 21, 2021, in response to a post that read "SEATTLE GOVERNMENT OFFICIALS COORDINATED THE CHAZ ZONE WITH AN AK-WIELDING TERRORIST WARLORD, BUT THE FBI WOULD RATHER TARGET THIS WEBSITE FOR THE 'CRIME' OF SUPPORTING PRESIDENT DONALD J. TRUMP," Slaeker replied "Our bad. We didn't know we were supposed to schedule the occupation of government buildings with government officials. It was my first time, sorry."[8] This flippant reference to his participation in the events of January 6, shows a lack of remorse.

On January 7, 2022, months after Slaker had been charged in this case, he posted a photograph of a cake[9] depicting the U.S. Capitol building, with the words "Happy Jan 6" written on the cake in icing with a "1" candle and a Trump 2022 sign.[10]   The title of Slaeker's post was "Can we please STICKY this cake?  Some Pedes haven't had any yet.  Happy 6th!"  Slaeker also

---

[7]      This post is available at
https://web.archive.org/web/20220530233039/https://patriots.win/p/15IEJpMuNU/i-am-a-jan6-defendant-i-only-hav/

[8]      This post is available at
https://web.archive.org/web/20210123030310/https://patriots.win/p/11S0zAl7RA/seattle-government-officials-coo/

[9]      The kitchen in the cake photograph posted by Slaeker is consistent with his kitchen as seen in photographs on the website Zillow.  https://www.zillow.com/homedetails/7449-Les-Hughes-Rd-Fairview-TN-37062/81320599_zpid/?mmlb=g,11

[10]      This post is available here
https://web.archive.org/web/20220107014557/https://patriots.win/p/140vxljM1v/can-we-please-sticky-this-cake-s/c/

indicated that his children had helped him make the cake ("My 6yo and 8yo helped me roll out the intricate stuff").  This celebration of the first anniversary of the January 6 riot shows that, rather than demonstrating any sincere remorse over his actions, the defendant believes that they should be celebrated.



*Exhibit 23*

Shortly after the FBI conducted a search of former President Trump's residence in Florida, Slaker made disturbing comments about potential future violence.   Specifically, on August 8, 2022, a user posted on TheDonald "lock and load."  Slaker responded "[a]re we not in a civil war at this point?"  When asked to elaborate, Slaker replied, "I am awaiting sentencing for trespassing into the Capitol. I am only being careful with my words."  One can only imagine what Slaker's

true beliefs are if his comment that a civil war is imminent are him "being careful" with his words. After news articles referenced Slaeker's "civil war" comments, [11] he edited his post to add "Thanks for stopping by, NBC.  Enjoy some cake I made" and included a link to his January 6 cake.



*Exhibit 24*

All of the defendant's comments, even months after January 6, even after being arrested and even after pleading guilty, show a total lack of contrition for his actions.

*The Charges and Plea Agreement*

On July 27, 2021, the United States charged Slaeker by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On August 4, 2021, law enforcement officers arrested him at his home in Washington state. On September 28, 2021, the United States charged Slaeker by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On June 10, 2022, pursuant to a plea agreement, Slaeker pleaded guilty to Count One of the Information, charging him with a

---

[11]     *See  e.g.,*  https://www.nbcnews.com/politics/justice-department/mar-lago-search-users-trump-forums-agitate-civil-war-jan-6-rioter-rcna42148.

violation of 18 U.S.C. § 1752(a)(1). In that agreement, Defendant promised to pay $500 in restitution to the Department of the Treasury.

## I.      Statutory Penalties

Slaeker now faces a sentencing on a single count of violating 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to 12 months of imprisonment and a fine of up to $100,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Slaeker's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 24-32.

The U.S. Probation Office calculated Slaeker's criminal history as a category I. PSR at ¶ 35. Accordingly, the U.S. Probation Office calculated Slaeker's total adjusted offense level, after acceptance, at 4, and his corresponding Guidelines imprisonment range at 0-6 months. PSR at ¶¶ 32, 71. Slaeker's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

## II.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as

described below, the Section 3553(a) factors weigh in favor of a term of incarceration of three months.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 was a crime unparalleled in American history and defies comparison to other violent riots. It represented a grave threat to our democratic norms and practices. Indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant must be sentenced based on their own conduct, this Court should take into account that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances. As they entered the Capitol, they very likely crossed through numerous barriers and barricades and heard the violent outcries of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting between the rioters and police and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while assessing Slaeker's individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) defendant's reaction to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police officers; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

Had Slaeker personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of Slaeker is therefore not a mitigating factor in a misdemeanor case.

The defendant's entry into the Capitol and behavior after leaving raise significant concerns. While Slaeker himself did not participate in any physical attacks, his reaction to acts of violence or destruction is telling.  He stood by while other rioters screamed threatening language at police officers and assaulted them.  Exhibit 6 encapsulates the defendant's posture on that day – he continually observed and documented violence and brutality, including observing a wounded officer with "blood running down his face," and then capitalized on it to continue his advance on the Capitol, ultimately unlawfully entering the Capitol in its wake.  After observing the violence and mayhem on the West Front and the Lower West Terrace, he clearly knew that he did not have permission to enter the Capitol and did so anyway—remaining inside for more than 15 minutes. Then, after exiting the Capitol he returned to the West Front where he continued to observe and capture additional violence against law enforcement.

While no police officers blocked Slaeker's path into the Capitol, there were clear signs of violent entry all around him.  Indeed, rioters were arming themselves with pieces of scaffolding near the Upper West Terrace door where Slaeker entered. He also would have heard the alarm sounding throughout the Capitol Rotunda and its antechamber: a loud, high-pitched, continuous beeping, similar to a smoke alarm. Slaeker was also aware that tear gas and OC spray were being deployed, having documented it on the Lower West Terrace and West Front, respectively as seen in Exhibits 19 and 6.  None of this violence and destruction deterred Slaeker.  Instead, he continued on and encountered more and more violence, which he observed and documented.

Slaeker's statements after January 6 also show a total lack of remorse. On January 6, 2021, he texted an individual "If they want to arrest me for it fine."  Over time, Slaeker's lack of contrition for his actions has continued.  Indeed, he celebrated the anniversary of the January 6 attack by baking a cake in the shape of the Capitol building with his children.

The defendant's statements that "We didn't know we were supposed to schedule the occupation of government buildings with government officials. It was my first time, sorry," and that we are "in a civil war at this point" help to not only illuminate Slaeker's intent on January 6 but also reveal the potential for future violence or acts of criminality from this defendant. Slaeker has also made multiple references to the Boston Tea Party and stated that "It is going to get ugly because it's not like they listened to the 500k that were there. They quadrupled down, told them all to shut up, then silence them while calling them evil. No one there is saying to themselves, 'gee I guess they're right, I am evil and the election was fair. My bad'."  Slaeker's own words demonstrate a very real possibility of future criminal activity in the name of "civil war," and impel the government to seek a significant jail sentence in this case.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of three months' incarceration in this matter.

### B.  The History and Characteristics of Slaeker

As set forth in the PSR, Slaeker has no criminal history (PSR ¶¶33, 34.) Slaeker is 40 years old and, while currently unemployed, works as a freelance private investigator.

As noted in the PSR, the defendant has not fully complied with certain of his pretrial release conditions.  (PSR ¶¶ 8 – 8g.) On August 12, 2021, Magistrate Judge Meriweather imposed the release condition that Slaeker not possess a firearm.  ECF No. 10.  On October 27, 2021, Pretrial Services filed a Compliance Report.  ECF No. 27.  The report noted that "[d]espite multiple

requests, the defendant failed to provide the US Probation Office for the Western District of Washington documentation showing he transferred his firearms to his father." *Id.*  For more than two months after the Court ordered the defendant not to possess firearms, instead of complying with the condition, the defendant "complained incessantly about the bond condition." *Id.* Although Slaeker was ordered not to possess firearms by Judge Meriweather on August 12, 2021, he failed to provide documentation of the transfer of his firearms to Pretrial in a timely manner. Indeed, Slaeker did not provide a Custodian Firearms Form to Pretrial Services for 76 days and did not indicate on the form what kinds of firearms he had owned or to whom he had transferred them.  The defendant also initially refused to permit Pretrial Services to inspect his home. *Id.*

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law and a "national disgrace." *United States v. Stotts*, 21-CR-272, Tr. 11/9/21 at 31 (Judge Kelly).  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[12] As this Court has previously explained, what "came to be" that day "was a riot, was an incitement, was an insurrection, was an obstruction of one of the branches of our government" with "long-term effects about how the legislative branch functions and how it's still threatened and on tenterhooks" that are "incredibly problematic for a democratic society." *See United States v. Ehrke*, 1:21-cr-97- PLF, Tr. 9/17/2021 at 15.  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including

---

[12]    Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the

impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The defendant's brazenness in publicizing his crimes shows the need for specific deterrence in this case.  It is concerning enough that Slaeker decided to enter the Capitol building after documenting the violence and destruction all around him.  But, following his actions on January 6, the defendant has displayed a pride in doing so.  Slaeker has yet to make any statement apologizing for or expressing regret for his conduct on January 6, 2021.  Instead, his conduct while on pretrial release, including violating the terms of his pretrial release and celebrating the anniversary of January 6 indicate his disregard for the rule of law. This behavior, and his statements about "civil war" and the Boston Tea Party, strongly suggests that Slaeker will continue to engage in conduct that obstructs and/or impedes political outcomes with which he does not agree. A sentence of incarceration is thus warranted to specifically deter the defendant from engaging in this conduct in the future, as well as to protect the community.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as

in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[13] This Court must sentence Slaeker based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot. Although those like Slaeker convicted of misdemeanors are generally less culpable than defendants convicted of felonies, misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not be the default.[14]  *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth at sentencing). Accord, *United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 (statement of Judge Friedman).

Slaeker has pleaded guilty to Count One of the Information, charging him with Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with

---

[13]     Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[14]     Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Sentencing judges and parties have tended to rely on other Capitol siege cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For

that reason, a permissible sentence imposed for a misdemeanor is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range for a misdemeanor offense is zero to twelve months. Given that narrow range, a sentence of twelve months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom.   *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.  The government has often recommended, and judges have imposed, periods of incarceration in cases where a defendant's conduct has included one or more of the various aggravating factors present here. For instance, Judges have imposed incarceration in cases where the defendant witnessed and/or recorded breaches or violence against police officer. *See, e.g., United States v. Anthony Vuksanaj*, 1:21- CR-00620 (imposing 42 days' intermittent confinement and 36 months' probation where, among other things, defendant was present during two physical clashes with police, and yet did not exit the building

but instead continued to trespass through the Capitol); *United States v. David Mish*, 1:21-CR-00112 (imposing sentence of 30 days' jail time where, among other things, defendant, who was in the Capitol for about 30 minutes, took photos, heard the shot that killed Ashli Babbitt, and witnessed violence against law enforcement); *United States v. Philip Bromley*, 1:21-cr-00250 (PLF) (imposing 90-day sentence where defendant was inside the Capitol building for less 10 minutes inside the Capitol, yelled at police officers and encouraged his cousin to attempt to breach a set of doors)

Judges have also imposed incarceration in cases where the defendant's words and/or actions demonstrated a lack of remorse. *See, e.g., United States v. Jeremiah Caplinger*, 1:21-CR-00342 (imposing 35 days' jail time and 24 months' probation where, among other things, defendant engaged in a multitude of behaviors that demonstrated a lack of remorse: posting statements on social media on and after Jan. 6th that demonstrated a lack of remorse, participating in a photoshoot and giving interviews that demonstrated a lack of remorse to two separate publications, omitting information and repeatedly downplaying his actions on January 6th during an FBI interview, and shirking the terms of his pretrial release by repeatedly used marijuana); *United States v. Philip Weisbecker*, 1:21-CR-00682 (imposing 30 days' intermittent confinement and 24 months' probation where, among other things, defendant wandered through restricted hallways and into the Rotunda where he took photographs of himself, posted statements on social media which demonstrated a total lack of remorse, verbally abused law enforcement officials who stopped and questioned him about January 6 and engaged in post-guilty plea verbally abusive conduct towards transportation officials he believed harassed him, demonstrated defendant's contempt for public officials); *United States v. Gracyn Courtright*, 1:21-cr-00072 (imposing a sentence of 30 days' incarceration followed by a term of 12 months of supervised release, where

among other things, the defendant made it to the Senate floor, witnessed rioters damaging property and exemplified a complete lack of remorse); *United States v. Jennifer Leigh Ryan*, 1:21-cr-00050 (CRC) (imposing a sentence of 60 days' incarceration and a $1,000 fine where defendant exhibited no remorse and made social media posts explaining that she "did not regret" her actions at the Capitol and instead "deserved a medal.").

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## III.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to a term of incarceration in the middle of the guideline range as calculated by the United States Probation Department, followed by one year of supervised release, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by

imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:  */s/ Nadia E. Moore*
NADIA E. MOORE, NY Bar No. 4826566
On Detail to the District of Columbia
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20001

## <u>CERTIFICATE OF SERVICE</u>

On this 5th day of December 2022, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

<u>*/s/ Nadia E. Moore*</u>
NADIA E. MOORE, NY Bar No. 4826566
          On Detail to the District of Columbia
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530